UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAIAH MELEKE LAWRENCE, BMH033,<br><br>Plaintiff,<br><br>v.<br><br>GREGOIRE, Deputy Sheriff, et al.,<br><br>Defendant(s). | Case No. 24-cv-05347-CRB  (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF No. 22) |

      Plaintiff, a pretrial detainee at the Alameda County Jail, Santa Rita Facility, filed a pro se First Amended Complaint (FAC) for damages under 42 U.S.C. § 1983 alleging that on April 4, 2024, two deputy sheriffs at the jail used excessive force against him. Plaintiff specifically alleges that after deputy sheriffs Gregoire and Silvia handcuffed him with his hands behind his back and took him to processing for fingerprinting and photographing, Gregoire "grabbed me by the hair & began to pull and twist my head" and Silvia "chopped me at my throat and started chocking me." ECF No. 15 (FAC) at 3. Plaintiff fell to the ground and Gregoire "climbed on top of me and continued to pull my hair." Id. The deputies then placed plaintiff on a restraint chair and, while on the chair, Silvia "choked me from behind by pulling my shirt around my neck." Id. Plaintiff alleges that he sustained injuries to his hand, wrist, arm and knee because of the use of force against him by Gregoire and Silvia.

      On April 25, 2025, the court found that, liberally construed, plaintiff's allegations arguably state a cognizable claim under § 1983 for use of excessive force in violation of the Due Process Clause against Gregoire and Silvia and ordered the United States Marshal to serve them.[1]

---

[1] The court dismissed the warden/sheriff and the jail because "they are named solely on the theory that, as superior or employer, they are responsible for the actions or omission of the jail's employees, and it is well established that there is no liability under § 1983 solely because one is responsible for the actions or omissions of another." ECF No. 16 at 3 (citing Taylor v. List, 880

Defendants now move for summary judgment on the ground that they are entitled to judgment as a matter of law because the body worn video recordings of the incident make clear that defendants' actions in connection with the April 4, 2024, incident were objectively reasonable under the totality of circumstances confronting them. Defendants specifically argue that the body worn video recordings show that plaintiff refused to comply with jail photographing and fingerprinting protocols and that defendants used minimal force, if any, to obtain his compliance. Defendants also claim that they are entitled to qualified immunity. Plaintiff did not file an opposition despite being advised to do so.

## DISCUSSION

A.   Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, [as is the case here,] the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of materials in the record" or "showing that the materials cited do not establish the absence

---

F.2d 1040, 1045 (9th Cir. 1989)).

or presence of a genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of material fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249-50.

B.     Analysis

Defendants argue that they are entitled to summary judgment and qualified immunity on plaintiff's excessive force claim. Under Saucier v. Katz, 533 U.S. 194 (2001), the court must undertake a two-step analysis when a defendant asserts qualified immunity in a motion for summary judgment. The court first faces "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If the court determines that the conduct did not violate a constitutional right, the inquiry is over, and the officer is entitled to qualified immunity.

If the court determines that the conduct did violate a constitutional right, it then moves to the second step and asks, "whether the right was clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02. Even if the violated right was clearly established, qualified immunity shields an officer from suit when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he confronted. Brosseau v. Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 205-06. If "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." Id. at 205.[2]

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial

---

[2] Although the Saucier sequence is often appropriate and beneficial, it is not mandatory. A court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

detainee from the use of excessive force that amounts to punishment. Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) (citing Bell v. Wolfish, 441 U.S. 520, 535-39 (1979)). To prove an excessive force claim under § 1983, a pretrial detainee must show that the "force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" Id. (quoting Graham, 490 U.S. at 396).

A non-exhaustive list of considerations that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id. at 397.

1.   Summary Judgment

Defendants argue that this case is proper for summary judgment because the body worn video recordings of the April 4, 2024, incident make clear that plaintiff's version of the incident is a "visible fiction" as in Scott v. Harris, 550 U.S. 372 (2007). In Harris, a videotape captured the events and contradicted Harris' claims that Scott's use of force was unreasonable under the circumstances. Given the video evidence, the Court found Harris' "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him. The [lolwer court] should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." 550 U.S. at 380-381. The same rationale applies here.

Defendants submit declarations and documentary evidence showing that in the morning of April 4, 2024, Deputy Gregoire observed plaintiff trying to "cheek" the medication nursing staff had dispensed to him. Gregoire Decl. (ECF No. 22-1) ¶ 9. "Cheeking" is a practice where an inmate attempts to smuggle dispensed medications back into their housing pod where they later sell or barter the medications for food, favor, or money. Id. Because of the dangers of someone overdosing or taking medication not prescribed to them, Gregoire could not allow plaintiff to

return to his assigned pod and instead escorted him to the Temporary Holding Cell (THC).  Id. ¶10; Silvia Decl. (ECF No. 22-2) ¶8.

While in the THC, plaintiff started screaming, kicking, and pounding on the cell door, causing damage to the cell door lock, which had to be replaced as a result of the damage caused by plaintiff.  The locksmith estimated the cost to replace the lock was around $2,500.00.  As a result, Gregoire determined that plaintiff would be placed under arrest and booked for a violation of Penal Code section 594(b)(1)–vandalism resulting in more than $400 in damage.  Gregoire Decl. ¶11; Silvia Decl. ¶9.  Gregoire asked Deputy Silvia to assist him with the arrest and booking of plaintiff.  Gregoire Decl. ¶12; Silvia Decl. ¶10.

At approximately 2:00 PM, Gregoire placed plaintiff under arrest and escorted him to the Intake, Transfer, Release (ITR) area of the jail to book him for a violation of section 594(b)(1).  Gregoire Decl. ¶13.  When plaintiff and defendants arrived at ITR, Gregoire began to initiate the booking process, but plaintiff became agitated and stated, "Ya'll be lyin' bruh…fuckin' lyin'…ain't got no evidence, bruh…don't give a fuck about no vandalism charge…every time you put me in that iso cell I'm gonna do the same thing, kick the door."  Id. ¶17; Silvia Decl. ¶16.  Plaintiff refused to cooperate with defendants during the booking process and ignored several commands to face toward the booking camera to be photographed.  Gregoire Decl. ¶18; Silvia Decl. ¶17.  Silvia stated, "look up here at the camera" but plaintiff refused and said, "no," turning his head away from the camera and looking downwards so his hair was partially obscuring his face, and stated, "I ain't lookin' at no camera…you can't force me to look at no camera…" Silvia Decl. ¶ 18.  Silvia attempted to gently push Lawrence's hair out of his face.  Id.

Because plaintiff continue to resist being photographed for booking, defendants tried to position plaintiff's head for a clear photograph to be taken, by Gregoire holding up the top of plaintiff's hair while Silvia attempted to raise plaintiff's chin in a forward-facing position to be photographed.  Plaintiff began swearing at defendants and sat down on the floor, stating "stop grabbin' my hair, bitch", "stop choking [me]" and "I'm finna' sue you bitch ass niggas" in a hostile manner.  Plaintiff also kicked Gregoire in his left shin.  Gregoire Decl. ¶20; Silvia Decl. ¶19.  Gregoire ignored the kick and continued the booking process.  Gregoire Decl. ¶21.

5

Defendants then attempted to take plaintiff's booking photo while he was sitting on the ground. They did so by holding plaintiff in place and requesting that he look in a specific direction, but plaintiff replied, "I ain't lookin at shit!" and further falsely accused defendants of pulling his hair and "choking" him, and aggressively stated, "Fuck is wrong with you. I ain't gotta listen to you … bitch, you a coward." Gregoire Decl. ¶22; Silvia Decl. ¶20.

After plaintiff's booking photo was taken, defendants stood plaintiff up, and Gregoire escorted plaintiff to the fingerprinting room next door. Plaintiff demanded a wheelchair, yelling, "I can't walk, I can't walk, I can't walk." He continued to state profanities and yelled, "I'm finna sue you bitch ass niggas!" Gregoire Decl. ¶¶23-24; Silvia Decl. ¶¶21-22.

Plaintiff was provided with a wheelchair per his request. He called Gregoire a "punk ass white boy" and yelled "look how tight the cuffs on bitch," as well as yelling "stop choking me nigga!" in an irate manner, despite the fact that Gregoire was not choking him. Plaintiff then called Gregoire a "bitch ass nigga" and stated, "I said I'm not walking, that mean I ain't walking, nigga." Plaintiff began claiming that he could not breathe, despite the fact that he clearly could because he was yelling "I can't breathe bitch" and "hatin' ass nigga" in a loud and irate manner. Gregoire Decl. ¶25; Silvia Decl. ¶23. Plaintiff began yelling, "I ain't walkin'! I'm not walking!" and "you a mark! You a mark!" Gregoire Decl. ¶26; Silvia Decl. ¶24.

As defendants began wheeling plaintiff in the wheelchair, he yelled, "I'm taking both of you bitch ass niggas to court … you pulled my motherfuckin' hair…scared ass niggas." Plaintiff also stated, "fuck this jail nigga . . . fuck all y'all niggas … I don't give a fuck about this shit, nigga … I don't respect none of that shit, nigga … I'll take you bitch ass niggas to court . . . you a coward, bruh." Plaintiff then stated, "I'm not lookin' at no fuckin camera, nigga … I don't gotta follow your any and every word…the fuck you think I'm gonna follow your rules while I'm in jail?" Gregoire Decl. ¶27; Silvia Decl. ¶25. As defendants approached plaintiff's cell, plaintiff stated, "I'm gonna terrorize y'all." After he was placed in his cell, he stated, "bitch ass nigga…I'll break any lock I want." Gregoire Decl. ¶28; Silvia Decl. ¶26.

The April 4, 2024, incident with plaintiff was recorded by both defendants' body worn cameras. Gregoire Decl. ¶¶14-16; Silvia Decl. ¶¶13-15; Evans Decl. (ECF No. 22-3). The

recordings of the incident from both body worn cameras show that plaintiff's claimed version of the incident is a "visible fiction." Harris, 550 U.S. at 380. The recordings show that plaintiff was uncooperative from the moment defendants went to his cell to move him to ITR. He became belligerent, refused to cooperate with the booking process, verbally refused and physically resisted efforts to photograph him and take his fingerprints and moved and thrashed about. Plaintiff's assertion that he complied with instructions to look at the camera for photographing is utterly belied by the video recordings of the incident. In fact, the recordings show that from the first time that defendants asked plaintiff to look at the camera for photographing, plaintiff refused to raise his head and adamantly stated "No!" and repeatedly said, "You can't force me to look at no camera" as he refused to look up and repeatedly moved his head down. Because he was moving his head and looking down, his long hair fell in front of his face and prevented a clear photograph. As a result, Silvia attempted to brush plaintiff's hair out of his face so he could be photographed. Plaintiff abruptly jerked his head away and moved to avoid the attempt to clear his hair and continued moving his head and upper body around to resist photographing while he verbally continued refusing to be photographed. Gregoire then tried to hold plaintiff's hair up out of his face, while Silvia tried to put his hand under plaintiff's chin to stop him from ducking his head down. Plaintiff continued swearing at the deputies, verbally and physically resisting efforts to have his picture taken and then slid his back down the wall until he was sitting on the floor. The recordings show defendants were patient and respectful throughout, remained calm, did not react to plaintiff's increasingly loud swearing, insults and personal attacks, and notably used only minimal force, if any, to overcome plaintiff's physical resistance and raise his head to position him so he could be photographed. The recordings plainly show that Plaintiff's version of the incident alleging that Silvia "chopped" him at his throat and choked him, that the deputies did anything that caused plaintiff to fall to the ground, and that Gregoire "climbed" or "jumped" on top of him and pulled his hair is an utter visible fiction.

After plaintiff finally was photographed, he refused to get up and walk. Defendants patiently stood by and waited while plaintiff continued his verbal tirade and remained seated on the ground despite needing to move him to the fingerprinting area to be fingerprinted. Gregoire

eventually helped plaintiff stand up, and defendants walked with him to the fingerprinting area as plaintiff moved his weight around and resisted walking. Gregoire maintained minimal positive control to overcome plaintiff's resistance as he attempted to guide plaintiff toward the fingerprinting area. Plaintiff continued pushing back on Gregoire and pulling forward as he walked and demanded a wheelchair, claiming he was unable to walk. As they waited for a wheelchair, plaintiff became increasingly agitated, began yelling and swearing louder, tensed his body and arms and moved around as Gregoire attempted to maintain control by holding his wrist. A wheelchair was provided for plaintiff, as he requested, and he sat down in the chair. The recordings show no action by either defendant that would have injured plaintiff's knee or arm while he was assisted onto the wheelchair, as he claims. The recordings show that once plaintiff was placed in the wheelchair, he continued moving, thrashing around and shouting as defendants merely attempted to move the wheelchair to the fingerprinting machines to take his fingerprints. Gregoire held the back of plaintiff's shirt to keep him upright in the wheelchair and maintain some control over his movement, as plaintiff continued to be agitated and thrash about and falsely claim that Gregoire was choking him. The recordings show that any injuries plaintiff claims to have sustained (of which there is no proof other than his allegations) were caused by his physical resistance to defendants' minimal use of force, if any, to maintain control of his movements.

Plaintiff's claimed version of the April 4, 2024, incident is "so utterly discredited by the record that no reasonable jury could . . . believe[] him." Harris, 550 U.S. at 380. This court instead should "view[] the facts in the light depicted by the videotape[s]." Id. at 381. Those facts show that plaintiff was belligerent and uncooperative throughout the booking process, verbally refused to comply with orders and physically resisted defendants' efforts to photograph him and take his fingerprints and moved and thrashed around while cursing and threatening defendants. Defendants in turn only used minimal force, if any, to brush plaintiff's hair out of his face and raise his head for a quick photograph, obtained a wheelchair for plaintiff when he refused to walk and merely held the back of his shirt as he repeatedly jerked forward and away and thrashed around as he sat in the wheelchair yelling obscenities and falsely claiming that defendants were choking him. Under the totality of circumstances confronting defendants, their actions in

connection with the April 4, 2024, incident with plaintiff were not "objectively unreasonable." Kingsley, 576 U.S. at 397. Defendants are entitled to summary judgment on plaintiff's Fourteenth Amendment excessive force claim against them. See Celotex, 477 U.S. at 323.

2. Qualified Immunity

Defendants also are entitled to qualified immunity on plaintiff's Fourteenth Amendment excessive force claim against them. A reasonable deputy sheriff could have believed that his conduct—using minimal force to ensure that a resisting detainee complies with the jail's booking process—was lawful under the circumstances. See Saucier, 533 U.S. at 201–02. After all, plaintiff cannot identify any factually similar legal authority that squarely governs and prohibited defendants' conduct in the particular circumstance of this case, such that every reasonable deputy sheriff in the same situation would have known that the minimal use of force in response to plaintiff's resistance was unlawful.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (ECF No. 22) is GRANTED.

**IT IS SO ORDERED**.

Dated: December 12, 2025

_____
CHARLES R. BREYER
United States District Judge